**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

OLIGER MERKO,

       Petitioner,

v.

GREG MCQUIGGIN,

       Respondent.

_____/

CASE NO. 2:09-CV-14143
HONORABLE VICTORIA A. ROBERTS
UNITED STATES DISTRICT JUDGE

## OPINION AND ORDER DENYING THE
## PETITION FOR WRIT OF HABEAS CORPUS

Oliger Merko, ("Petitioner"), confined at the Chippewa Correctional Facility, seeks a writ

of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, Petitioner challenges his Oakland

Circuit Court conviction for conspiracy to commit first-degree murder, MICH. COMP. LAWS §

750.157a; second-degree murder, MICH. COMP. LAWS § 750.317; assault with intent to commit

murder, MICH. COMP. LAWS § 750.83; and three counts of assault with intent to do great bodily harm,

MICH. COMP. LAWS § 750.84. Petitioner was sentenced to prison terms of life without parole for the

crime of conspiracy to commit first-degree murder, life in prison for second-degree murder, life in

prison for assault with intent to murder, and five-to-ten years for each of the three counts of assault

with intent to do great bodily harm. For the reasons stated below, the application for writ of habeas

corpus is **DENIED.**

1

## I. **Background**

Petitioner's convictions stem from a dispute between two groups of Albanian-American men, culminating in a shooting that occurred on July 17, 2004, in Clawson, Michigan.

The evidence offered at trial revealed that the rivalry between the two groups began sometime in June 2004, after a fist fight. After the fight, a member of the victims' group was threatened and forced to pay medical bills for an injured member of Petitioner's group. A "peace meeting" was then held, and although members of both groups arrived with firearms, no fighting occurred. The two groups appeared to have resolved their differences and shook hands at the conclusion of the meeting.

But on July 15, 2004, two members of the victims' group, Mark Jaku and Martin Vucaj, broke the peace when they initiated a fist fight in front of a coffee shop because someone from Petitioner's group made disparaging remarks about a girlfriend. Some members of Petitioner's group were badly beaten during this fight.

Petitioner, and his co-defendants, Ketjol Manoku and Edmund Zoica became very upset when they saw the injuries to their comrades. Members of the victims' group were soon spotted at a coffee shop in Royal Oak, and Petitioner and his co-defendants were called to a nearby parking lot. Florjan Carcani met Petitioner, Manoku and Zoica in the parking lot. According to Carcani, Petitioner and Manoku wanted to shoot members of the other group on the spot, but Zoica persuaded them not to because the area was crowded with people.

The next day, July 16, 2004, Carcani was with other members of Petitioner's group at a restaurant. Petitioner and his co-defendants were upset at the failed chance to shoot members of the other group on the previous day. According to Carcani, Petitioner formulated a plan for Manoku to ride on the back of a motorcycle driven by Carcani and shoot at members of the other group while

2

they were coming out of a coffee shop. Arjan Malushi, a paid informant for the Troy Police Department, heard of this plan and informed the police.

During the evening hours of Saturday July 17, 2004, Carcani disguised his motorcycle pursuant to the plan. Petitioner and his two co-defendants were present, and Carcani saw that Manoku was armed with a handgun. Carcani testified that all three defendants were known to carry guns. The group then drove to apartments near the location of the coffee shop where, Erjon Barki, another member of their group, lived. The apartment complex apparently had a large Albanian population. The group was standing in the parking lot when Carcani saw a van moving very slowly with high beam lights enter the parking lot of the apartments.

The van was occupied by the victims, Dhimiter Qafko, Marikol Jaku, Martin Vucaj, Ilirjan Dibra, and Romeo Toro. They had just finished helping Toro with preparations for the opening of his coffee shop, and they drove to the apartments to pick up some girls they knew who lived there. As the van drove slowly through the parking lot, they noticed four individuals standing near a SUV.

Petitioner and Manoku walked toward the approaching van. Petitioner walked towards the passenger side of the van where Vucaj was sitting, and asked, "What's up" or "What do you want?" Vucaj and Dibra testified that they saw that Petitioner had his hand on a weapon in his belt, under his shirt. Meanwhile, Manoku walked towards the driver's side of the van, pulled a gun from his waist, and pointed it at the driver, Jaku. Manoku began shooting at the van and continued to do so as Jaku to drove the van away.

A short distance away from the apartments, Jaku collapsed in the driver's seat. Vucaj took over driving, but he had been shot in the wrist and was also having difficulty. Qafko took over, and drove to Beaumont hospital.

3

The passengers in the van denied that they had any weapons in their hands as Petitioner and Manoku approached, and they denied doing anything threatening in the parking lot. A lead pipe found in the van was purportedly related to the construction work at the coffee shop. Toro's younger brother Qani, who was with them at the coffe shop that evening, claimed he never saw any of the five men from the group with weapons.

Carcarni testified about the shooting and subsequent events from his perspective. As soon as Petitioner saw the van driving slowly through the parking lot, Petitioner said, "It's them," and walked toward the van with Manoku following behind. Petitioner's group did not expect to see the victims' group at the apartments. Petitioner had his hand to his back, as though he had a gun, but Carcarni testified that Petitioner did not have a weapon with him that evening. From his position, Carcani did not see any threatening movements by the passengers, and he believed the front passenger and driver leaned in toward each other to protect themselves before exiting the parking lot. While the van was in motion, Manoku fired his gun at the driver's side window and then fired three more times as the van drove away. Petitioner did not fire any weapon at the van. When the van drove away, Petitioner and Manoku ran back to the Jeep and all four left the parking lot, stopping at a garbage dumpster to dispose of weapons and extra clothing that Manoku was wearing.

The four then went to a bar to discuss an alibi. They decided to say that they were attending a bachelor party in honor of Petitioner, who was to be married the following day. They went back to a friend's apartment to facilitate the party. Petitioner called to have his fiancée Linda be brought to the apartment.

None of the four surviving passengers identified Petitioner or Manoku to the police at the hospital even though they knew who they were and recognized them at the time of the incident.

4

Qafko was afraid of retaliation if he identified them to police. Vucaj admitted lying to the police during the initial investigation. Dibra made no identification at the hospital because he said could not remember clearly what happened due to his injury. Toro explained that he was shocked because his friend just died in his arms, and he was afraid to tell the truth.

Vucaj was treated for a through-and-through gunshot wound to his right wrist. Toro was treated for a grazing wound to his neck. Dibra was treated for gunshot wounds to his back and arm.

Jaku arrived at the hospital unconscious and subsequently died from a single bullet wound that traveled through his heart and lung. The direction of the path of the bullet was consistent with Jaku being seated in a motor vehicle. Jaku appeared to have had another gunshot fired in his direction from 1-2 feet away at the time of the fatal shot, as evidenced by gunshot residue in the form of "stippling" on his arms and face. A lock blade hunting knife was found on the hospital gurney that apparently fell from Jaku's clothing.

Officers were dispatched to the scene of the shooting. A large amount of broken, tinted glass was found in the parking lot area of the apartment building along with four spent shell casings. The casings appeared to be .9 mm Lugers, similar in size and shape to each other.

The victims' van had no intact windows on the driver's side of the vehicle. Police determined that the driver's side window was closed when it was fired upon. Blood was observed on the seats. There were also bullet holes in the rear of the van, through the seats including the front driver and the front passenger door above the arm rest. Spent shell casings recovered from inside the vehicle as well as the bullet retrieved from Jaku's body were fired from the same .9 mm weapon. Aside from the lead pipe, a small metal bar was found behind the driver's seat on the floor of the van.

Merko's Jeep was also inspected for evidence, and a switchblade knife was found on the

5

floor of the vehicle.

Petitioner and his fiancée Linda were picked up at approximately 4:00 a.m. on the morning after the shooting by Linda's sister and her mother. Petitioner and Linda were hiding in some bushes outside of the apartments and jumped into Roberta's car as soon as she approached the area. Petitioner explained that people had been shot and one died. They drove to a nearby restaurant where Petitioner asked Roberta to fabricate a story if the police asked any questions.

On July 18, 2004, Malushi turned over two guns and two boxes of ammunition to the Troy Police Department. These four items were admitted into evidence at trial. The ammunition was consistent with the spent shell casings found in the van that was shot at the prior evening. About a week later, Petitioner, not aware that Malushi had turned over these items, asked Malushi for the guns along with $2,000.00 for a lawyer. Petitioner became upset and assaulted Malushi when Malushi told him he lost the guns.

Petitioner's wedding ceremony was scheduled to occur on July 18, 2004, but was cancelled after the shooting. Petitioner stayed with Linda and her family for a few days but moved out of town when Petitioner was charged with murder. Petitioner was heard to say that Jaku deserved to die. He refused to turn himself in because he believed there were witnesses against him. Petitioner was looking for weapons to kill the witnesses before he left town. After Petitioner and Linda moved, Linda's family received threats from Petitioner. Linda's family moved to Florida.

Carcani was arrested on the night of the shooting. Upon his initial release, Carcani moved to Chicago and then to Florida. Carcani was scared of Zoica, Petitioner, and the police, and he testified that Zoica threatened him. Carcani testified that he received a substantial reduction of the charges and potential sentences against him in both state and federal court in exchange for his

6

testimony against Petitioner, Manoku, and Zoica.

On July 22, 2004, Vucaj, Toro and Qafko went to the police. Vucaj identified Manoku as the shooter. Vucaj, Dibra and Qafko also all identified Petitioner in a photographic lineup as being present at the shooting.

On February 10, 2005, Petitioner was arrested without incident in Garfield City, New Jersey pursuant to an Unlawful Flight to Avoid Prosecution warrant executed by the FBI. He had $2,300.00 on him as well as Michigan and federal-issued identification in his own and other people's names. At the time, Petitioner acknowledged that he knew Manoku had been charged with murder, but maintained that he was at his bachelor party at the time of the shooting.

The jury found Petitioner guilty of conspiracy to commit first-degree murder, second-degree murder for the death of Jaku, assault with intent to murder as to Vucaj, and the lesser offenses of assault with intent to do great bodily harm as to Dibra, Toro, and Qafko. The jury found Petitioner not guilty of all six of the corresponding felony firearm charges.

On March 15, 2006, Petitioner was sentenced to life without parole for the conspiracy conviction, life in prison for second-degree murder, life in prison for assault with intent to murder, and five-to-ten years for each of the three counts of assault with intent to do great bodily harm.

Petitioner appealed by right. His appellate brief raised what now form his four habeas claims. The Michigan Court of Appeals affirmed. *People v. Merko*, 2008 Mich. App. LEXIS 590 (Mich. Ct. App. Mar. 20, 2008). Petitioner sought to appeal this decision to the Michigan Supreme Court, but his application for leave to appeal was denied. *People v. Merko*, 482 Mich. 897, 753 N.W.2d 148 (2008).

Petitioner now seeks a writ of habeas corpus on the following grounds:

7

I. Petitioner was denied his constitutional right to a fair trial by the admission of prior-bad-acts evidence that portrayed him as a "bad man" with a propensity to commit the instant crime.

II. Petitioner was denied his constitutional right to present a defense when the trial court refused to instruct the jury on self-defense.

III. There was insufficient evidence to convict Petitioner of conspiracy to commit first-degree murder.

IV. The trial court denied Petitioner a fair trial by: (A) admitting gruesome autopsy photographs; (B) allowing the prosecutor to commit misconduct in closing argument; and (C) admitting a hearsay statement in violation of the Confrontation Clause.

## II. **Standard of Review**

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can

show that the state court's adjudication of his claims on the merits-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the

state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable

application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court]

to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply

8

because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, No. 2011 WL 148587, * 11 (U.S. 2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. 770.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's

9

precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## III. **Discussion**

### A. **Prior Bad Acts Evidence**

Petitioner first claims that the admission of prior-bad-acts evidence at his trial was so unfairly prejudicial that it rendered his trial fundamentally unfair in violation of the Fourteenth Amendment.

Specifically, Petitioner points to evidence that he and his co-defendants were involved in the assault and extortion of money from Kutjim Karapici–a friend of members of the victims' group–to pay for medical bills after the June fist fight. About two weeks after the fight, Petitioner and Merko picked up Karapici, drove him to an apartment, sat him on plastic sheeting in view of a table with knives on it, and threatened him with a gun. After pleading for his life and offering to pay $1,000 for medical bills, Karapici was let go. Petitioner also complains that the prosecutor solicited testimony that a week after the shooting Petitioner demanded the guns back from Malushi, even though they were not the guns used in the shooting, and that he also wanted $2,000 to pay for an attorney. Petitioner asserts that neither his response to the initial fight nor the guns had any connection to the charged offenses, but that they merely were offered as evidence that he was a bad

10

man.

Petitioner's claim is without merit because it cannot be supported by clearly established Supreme Court law as required by § 2254(d). The United States Supreme Court has declined to hold that "other acts" evidence is so extremely unfair that its admission may violate fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53(1990). Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, there is no Supreme Court precedent that the state-court decisions could be deemed "contrary to" under § 2254(d)(1). *Id.* at 513; *see also Adams v. Smith*, 280 F.Supp.2d 704, 716 (E.D. Mich. 2003) (same).

Furthermore, even if Petitioner stated a cognizable claim in this regard, he is not entitled to relief. Petitioner has not shown that the disputed evidence rendered his trial fundamentally unfair. As explained by the Michigan Court of Appeals in reviewing this issue under state law, the evidence was offered for the proper purpose of proving Petitioner's intent, preparation, knowledge, opportunity, or absence of mistake. Specifically, the prosecution argued that the evidence showed that Petitioner had worked together with other members of his group to commit violent acts with handguns against friends and members of the other group during the same time period as the shooting. The evidence revealed the animosity between the rival groups and the escalation of that rivalry, creating a context and providing a motive for the shooting. The evidence was highly relevant to rebut the notion that Petitioner was merely present on the night of the shooting. Because the state court found that the disputed testimony was properly admitted under state law for these purposes, Petitioner has not shown that the admission of this evidence was erroneous or, more importantly, that

11

it rendered his trial fundamentally unfair. Habeas relief is not warranted based on this claim.

## B. **Right to Present a Defense**

Petitioner next asserts that his right to present a defense was violated when the trial court refused to instruct the jury on self-defense.

Petitioner argues that evidence presented at trial showed that members of the victims' group carried firearms at the "peace meeting." He points out that the evidence also showed that Petitioner was aware of the severe beating members of his group received during previous fist fights. He also asserts that the meeting in the parking lot between the groups was unexpected, and that because Vucaj had threatened a member of his group, he feared that they were being attacked. Based on this evidence, Petitioner argues that he was entitled to a jury instruction on self-defense.

A defendant in a criminal trial has the right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "[A] necessary corollary of this holding is the rule that a defendant in a criminal trial has the right, under appropriate circumstances, to have the jury instructed on his or her defense, for the right to present a defense would be meaningless were a trial court completely free to ignore that defense when giving instructions." *See Taylor v. Withrow*, 288 F. 3d 846, 852 (6th Cir. 2002). A defendant is therefore entitled to a jury instruction as to any recognized defense for which there exists evidence sufficient for a reasonable juror to find in his or her favor. *Mathews v. United States*, 485 U.S. 58, 63 (1988). A state trial court's failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the Due Process Clause. *Taylor*, 288 F. 3d at 851.

Under Michigan law, one acts lawfully in self-defense if he or she honestly and reasonably

12

believes that he or she is in danger of serious bodily harm or death, as judged by the circumstances as they appeared to the defendant at the time of the act. *Blanton v. Elo*, 186 F. 3d 712, 713, fn. 1 (6th Cir. 1999) (citing to *People v. Heflin*, 434 Mich. 482, 456 N.W.2d 10 (1990)). To be lawful self-defense, the evidence must show that: (1) the defendant honestly and reasonably believed that he was in danger; (2) the danger feared was death or serious bodily harm or imminent forcible sexual penetration; (3) the action taken appeared at the time to be immediately necessary; and (4) the defendant was not the initial aggressor. *See Johnigan v. Elo*, 207 F. Supp. 2d 599, 608-09 (E.D. Mich. 2002) (citing *People v. Barker*, 437 Mich. 161, 165, 468 N.W.2d 492 (1991); *People v. Kemp*, 202 Mich. App. 318, 322, 508 N.W.2d 184 (1993); *People v. Deason*, 148 Mich. App. 27, 31, 384 N.W.2d 72 (1985)). "[T]he law of self-defense is based on necessity, and a killing or use of potentially lethal force will be condoned only when the killing or use of potentially lethal force was the only escape from death, serious bodily harm, or imminent forcible sexual penetration under the circumstances." *Johnigan*, 207 F. Supp. 2d at 609 (internal citation omitted).

It was reasonable for the Michigan Court of Appeals to find that the trial court's refusal to instruct the jury on the defense of self-defense did not deprive Petitioner of a fair trial; there was insufficient evidence to support such an instruction. As the Michigan Court of Appeals said, the trial court refused to give a self-defense instruction on the grounds that Petitioner and Manoku were the initial aggressors when they approached the minivan, and that the minivan was pulling away from them before the shots were fired. The evidence also showed that the driver's window was closed when shots were fired. The medical examiner testified that Jaku had stippling injuries to the left side of his face, consistent with a shot fired at close range while he was seated in the driver's seat with his arms extended forward toward the steering wheel. There was no evidence that the people in the

13

minivan pointed or fired a gun at anyone. Nor was there evidence of threatening behavior by the men in the minivan before the shooting began. The trial court reasonably found that the elements of self-defense were wholly lacking.

Because there was no evidence to support Petitioner's self-defense claim, the trial court's failure to give an instruction on the defense of self-defense did not deprive him of his constitutional right to due process. *Allen v. Morris*, 845 F. 2d 610, 616-17 (6th Cir. 1988); *Melchior v. Jago*, 723 F. 2d 486, 493-94 (6th Cir. 1983). Petitioner is not entitled to relief on this claim.

## C. Sufficiency of the Evidence

Petitioner's third claim is that there was constitutionally insufficient evidence to sustain his conviction for conspiracy to commit first-degree murder. Conceding that there was evidence of a plan to commit a drive-by shooting, Petitioner argues that there was no evidence that he entered into a conspiracy with the specific intent to commit murder.

Sufficient evidence supports a conviction if, after viewing the evidence (and the inferences to be drawn from it) in the light most favorable to the prosecution, a court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006); *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). This standard of review does not permit a court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).

A conspiracy under Michigan law is defined as "a partnership in criminal purposes" in which

14

"two or more individuals. . .have voluntarily agreed to effectuate the commission of a criminal offense." *People v. Justice*, 454 Mich. 334, 562 N.W.2d 652, 657-58 (1997). To demonstrate the existence of a conspiracy, there must exist evidence "that the individuals specifically intended to combine to pursue the criminal objective of their agreement." *Id.* at 658. Such a showing is "critical" because "the gist of the offense of conspiracy lies in the unlawful agreement." *Id.* Direct proof of a conspiracy, however, is not required. *Id.* at 659. The existence of a conspiracy may be inferred "from the circumstances, acts, and conduct of the parties." *Id.* Because Petitioner was charged with conspiring to commit first-degree murder, it must be demonstrated that Petitioner and his co-conspirators agreed to commit an intentional, premeditated, and deliberate killing. *See People v. Foster*, 2003 Mich. App. LEXIS 799, 2003 WL 1558238 at *3 (Mich. Ct. App., Mar. 25, 2003).

The Michigan Court of Appeals rejected this claim:

[D]efendant "denies that he had any premeditated and deliberated intent to kill sufficient to support the crime of conspiracy to commit first degree murder." We disagree. In brief, considered in a light most favorable to the prosecution, the evidence revealed that defendant and his coconspirators met together on July 15, 2004, near a coffee shop in Royal Oak where members of the rival group were patronizing, for the purpose of shooting Markiol Jaku and Martin Vucaj, members of that rival group. Because the shop was very crowded with people, the shooting did not occur. Instead, later that night or the next evening, defendant and his coconspirators proceeded to watch the coffee shop the rival group members were fixing up to open which was called Goodfellows. Defendant and his coconspirators were dressed in dark clothing and were in vehicles with tinted windows. When one of the members of the rival group left the shop, coconspirator Zoica and some of his friends followed. Zoica rolled his window down and had a handgun but did not shoot at the rival group member possibly because of heavy traffic or because they could not tail him close enough to get off a shot.

The day before the shooting, July 16, 2004, defendant and his coconspirators met at a coney island to discuss shooting members of the rival group at Goodfellows. Later that day, they also met at Manoku's apartment to discuss the shooting. They developed a plan to return to Goodfellows and "shoot up the people," meaning shoot members of the rival group. Manoku would ride on the back of a motorcycle and do

15

the shooting. The shooting would occur the next night, July 17, 2004, the night before defendant's wedding.

The next day--the day of the planned shooting--they prepared for the shooting by retrieving weapons, including an AK-47 assault rifle. The assault rifle was placed in defendant's vehicle. After the motorcycle was in position for the shooting, the plan was changed and defendant and his coconspirators went to an apartment complex. While in the parking lot, where defendant and his coconspirators were standing by their vehicle that held the AK-47, a minivan carrying rival group members pulled into the parking lot. Defendant quickly approached the minivan with Manoku right behind. Shortly thereafter Manoku pulled his nine millimeter handgun and opened fire, shooting four of the five people in the minivan as it was attempting to leave. After disposing of evidence and agreeing to an alibi, defendant and his coconspirators went to Zoica's apartment and pretended to be having a party. When the police arrived, defendant left the scene and stayed in the basement of his wife's family's house for days. Defendant was overhead saying "that mother fucker deserved to die." He was also heard trying to secure three to four guns that he would use to kill the witnesses. Defendant threatened his wife's family saying "You guys do anything, you go to police or you guys talk, anything, we're going to blow your house." The family sold their home and business and fled the state.

Considering all of the facts and circumstances surrounding the crime, we conclude that the evidence at trial enabled the jury to find beyond a reasonable doubt that defendant and his coconspirators possessed the specific intent to murder and defendant and his coconspirators possessed the specific intent to combine for the purpose of deliberating and planning the murder with the intent to kill. Thus, the evidence was sufficient to support defendant's conviction.

*Merko*, 2008 Mich. App. LEXIS 590, at *14-17.

The rejection of this claim by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. The state appellate court applied the correct constitutional standard of review, and it accurately summarized the evidence that supported the verdict. Petitioner's argument focuses on the lack of direct evidence that Petitioner specifically intended to kill members of the victims' group. But viewed most favorably to the prosecution, a rational fact-finder could infer based on the nature and details of the plan that Petitioner and other members of his group specifically intended to kill one or more members of the

16

victims' group.   Accordingly, this claim does not provide a basis for granting habeas relief.

## D.  Claims Raised in Pro Se Brief

Petitioner's fourth habeas claim asserts three of the issues raised during his direct appeal in his pro se brief.  He says: (A) the trial court allowed the admission of gruesome autopsy photographs; (B) the prosecutor committed misconduct during closing argument, and (C) the trial court allowed admission of a hearsay statement in violation of his rights under the Confrontation Clause.  These meritless claims do not require extensive discussion.

With respect to the admission of the autopsy photographs, "'[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.'" *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005), quoting *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir.2002).  The Supreme Court stated that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).  The term "unfair prejudice," as to a criminal defendant, refers to the capacity of some relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged. *Old Chief v. United States*, 519 U.S. 172, 180 (1977).

The photographs were introduced to help the jury understand the pathologist's testimony, and to show the relative position of the shooter and victim at the time of the incident. While autopsy photographs are by their nature gruesome, the Sixth Circuit affirmed the admission of equally, if not more gruesome, and therefore more prejudicial, photographs than those here. See *Biros, supra*, (concluding that state court decision affirming the admission of "three photographs-depicting [the

17

victim's] severed head, her severed head held near her torso and severed breast, and her torso with the severed head and severed breast replaced on torso," was not unreasonable application of Supreme Court precedent because the photographs refuted the petitioner's account of the victim's death); *Frazier v. Huffman*, 343 F. 3d 780, 789 (6th Cir. 2003) (denying habeas relief where multiple photographs were introduced during the coroner's testimony to illustrate the testimony and that each photograph presented a different perspective of the victim, and that the photographs illustrated the nature of the encounter that immediately preceded the victim's death). Petitioner's trial was not rendered fundamentally unfair by the admission of these photographs.

Petitioner next says the prosecutor committed misconduct when he stated that there was no death penalty in Michigan, and by characterizing Petitioner as the leader of the criminal enterprise. The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). When a petitioner seeking habeas relief makes a claim of prosecutorial misconduct, the reviewing court must consider that the touchstone of due process is the fairness of the trial, not the culpability of the prosecutor. On habeas review, a court's role is to determine whether the conduct was so egregious as to render the entire trial fundamentally unfair. *Serra v. Michigan Department of Corrections*, 4 F. 3d 1348, 1355-1356 (6th Cir. 1993). When analyzing a claim of prosecutorial misconduct, a court must initially decide whether the challenged statements were improper. *Boyle v. Million*, 201 F. 3d 711, 717 (6th Cir. 2000). If the conduct is improper, the district court must then examine whether the statements or remarks are so flagrant as to constitute a denial of due process and warrant granting a writ. *Id.* In evaluating prosecutorial misconduct in a habeas case, consideration should be given to the degree to which the challenged remarks had a tendency to

18

mislead the jury and to prejudice the accused, whether they were isolated or extensive, whether they were deliberately or accidentally placed before the jury, and, except in the sentencing phase of a capital murder case, the strength of the competent proof against the accused. *Serra,* 4 F. 3d at 1355-56; *See also Simpson v. Warren,* 662 F. Supp. 2d 835, 853 (E.D. Mich. 2009).

The complained of remarks were not serious enough to deprive Petitioner of a fair trial. The comment that Petitioner was the leader of the criminal enterprise was fairly supported by the evidence. Testimony of several witnesses indicated that Petitioner played a leadership role in formulating the drive-by shooting plan, and that he was one of the primary actors in seeking revenge following the initial fist-fight. The comment that Michigan does not have the death penalty was technically not true because the death penalty can theoretically be imposed in a Federal Court in Michigan. But the point being made regarding the consideration a prosecution witness received in exchange for his testimony was essentially a fair one. The jury heard the evidence regarding the witness's motivations for testifying, and there is no reasonable likelihood that it was misled by this isolated comment. The conduct of the prosecutor did not render Petitioner's trial unfair.

Lastly, Petitioner claims that his rights under the Confrontation Clause were violated. The hearsay statements were statements made to Malushi and not to a police officer or in any another testimonial context. The Confrontation Clause is not implicated, and thus does not need not be considered, when nontestimonial hearsay is at issue. *See Davis v. Washington,* 547 U.S. 813, 823-26 (2006); *See also Desai v. Booker,* 538 F.3d 424, 425-26 (6th Cir. 2008). Accordingly, Petitioner's rights under the Confrontation Clause were not violated.

## IV. **Conclusion**

The Court denies the petition for writ of habeas corpus. The Court also denies a certificate

19

of appealability to Petitioner.

To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002).

The Court denies Petitioner a Certificate of Appealability because he failed to make a substantial showing of the denial of a federal constitutional right. Jurists of reason would not find this Court's resolution of Petitioner's claims to be debatable or that he should receive encouragement to proceed further. *Siebert v. Jackson,* 205 F. Supp. 2d 727, 735 (E.D. Mich. 2002).

Although this Court denies a certificate of appealability to Petitioner, the standard for granting an application for leave to proceed *in forma pauperis* (IFP) is a lower standard than the standard for certificates of appealability. *See Foster v. Ludwick,* 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002)(citing *United States v. Youngblood*, 116 F. 3d 1113, 1115 (5th Cir. 1997)). Whereas a certificate of appealability may only be granted if petitioner makes a substantial showing of the denial of a constitutional right , a court may grant IFP status if it finds that an appeal is being taken in good faith. *Id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). "Good faith" requires a

20

showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. *Foster,* 208 F. Supp. 2d at 765. Although jurists of reason would not debate this Court's resolution of Petitioner's claim, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed *in forma pauperis* on appeal. *Id.*

## V.   ORDER

The Court **DENIES** the Petition for Writ of Habeas and a Certificate of Appealability.

Petitioner is **GRANTED** leave to appeal *in forma pauperis.*

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  October 18, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on October 18, 2011.

S/Linda Vertriest
Deputy Clerk

21